## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

|  |  |  |
|---|---|---|
| STEVEN CARLSON, MARY GRAZNOW, RICHARD KETTELLS, and WILLIAM RAMSEY, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * * | 4:10-cv-00587 |
| JUSTICE DAVID WIGGINS,[1] in his official capacity as Chairman of the State Judicial Nominating Commission; JEAN DICKSON, STEVEN J. PACE, BETH WALKER, AMY J. SKOGERSON, JOSEPH L. FITZGIBBONS, GUY R. COOK, and H. DANIEL HOLM, JR., in their official capacities as Elective Members of the State Judicial Nominating Commission; MARGARET G. REDENBAUGH, COLEEN A. DENEFE, MARY BETH LAWLER, MADALIN A. WILLIAMS, DAVID C. COCHRAN, STEVEN BRODY, and TIMOTHY L. MIKKELSEN, in their official capacities as Appointive Members of the State Judicial Nominating Commission; and DAVID K. BOYD, in his official capacity as State Court Administrator, | * * * * * * * * * * * * * * * * * * * * | MEMORANDUM OPINION AND ORDER |
| Defendants. | * * | |

Currently before the Court are two motions. The first motion is "Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction," filed on December 8, 2010. Clerk's

No. 2. Defendants filed a response in opposition to this motion on December 23, 2010. Clerk's

---

[1]    Justice David Wiggins became chair of the State Judicial Nominating Commission on January 1, 2011. Therefore, Justice Wiggins has been substituted as a party in this case for Justice Mark Cady, who was the chair of the State Judicial Nominating Commission when this case was filed. *See* Fed. R. Civ. P. 25(d); *see also* Clerk's No. 35.

No. 31.  Plaintiffs filed a reply on January 3, 2011.[2]  Clerk's No. 32.  The American Civil

Liberties Union of Iowa, Foundation, Inc. (hereinafter the "ACLU of Iowa") has also filed, with

leave of court, an *amicus* brief regarding the issues raised in this motion.  *See* Clerk's Nos. 18-2,

34.[3]  The second motion before the Court is "Defendants' Motion to Dismiss," filed on

December 17, 2010.  Clerk's No. 10.  Plaintiffs filed a response in opposition to this motion on

January 3, 2011.  Clerk's No. 32.  Defendants did not file a reply.  The Court held a hearing on

both motions on January 6, 2010.  Clerk's No. 35.  At the hearing, the Court ordered Plaintiffs to

file a letter regarding the application of certain legal authorities to this case.  *See id.*  The Court

received Plaintiffs' letter on January 11, 2011.  *See* Clerk's No. 36.  The matters are fully

submitted.

## I. FACTUAL & HISTORICAL BACKGROUND

### A.  *The Development of the "Missouri Plan"*

"Since the American Revolutionary War, there have been heated debates about the best

methods for state judicial selection."   Rachel Paine Caufield, Ph.D., *How the Pickers Pick:*

*Finding a Set of Best Practices for Judicial Nominating Commissions*, 34 Fordham Urb. L.J.

163, 164 (2007) (hereinafter "Caufield").  From 1776 to 1830, states selected their judges by

appointment.  *See id.* at 166.  In the mid-nineteenth century, however, "a wave of  popularism

spread across the land" and "[i]t came to be thought that all public officials should be elected, for

---

[2]     Plaintiffs request that their "Response to Defendants' Motion to Dismiss" also be considered their reply regarding their own motion for preliminary relief.  Clerk's No. 32 at 1. That request is granted.

[3]     The ACLU of Iowa filed its proposed brief as an attachment to its motion for leave to file.  *See* Clerk's No. 18-2.  After the Court granted the ACLU of Iowa's motion, the ACLU of Iowa did not file its brief in a separate docket entry.  However, the Court will consider the ACLU of Iowa's brief to be filed at its current location, Clerk's No. 18-2.

short terms."  Harvey Uhlenhopp, *Judicial Reorganization in Iowa*, 44 Iowa L. Rev. 6, 52 (1958–1959) (hereinafter "Uhlenhopp"); *see also* Sandra Day O'Connor, *The Essentials and Expendables of the Missouri Plan*, 74 Mo. L. Rev. 479, 483 (2009) (hereinafter "O'Connor") (noting that, during this period, "[m]any people felt that appointive systems had allowed governors and legislators to award judgeships based on party loyalty rather than on legal ability, judicial temperament, or fair mindedness").  As a result, a number of states decided to change their judicial selection systems and began electing their judges by popular vote.  *See* Uhlenhopp at 52–53; Caufield at 167.

However, "by the close of the 19th century disenchantment [with elected judiciaries] had begun to set in."  Glenn R. Winters, *The Merit Plan for Judicial Selection and Tenure—Its Historical Development*, 7 Duq. L. Rev. 61, 64 (1968–1969) (hereinafter "Winters").  During the early decades of the twentieth century, the issues of judicial selection and retention gained increasing attention from commentators.  *See generally id.* at 64–65, 70.  For example, in a famous 1906 speech, Professor Roscoe Pound criticized elective judiciaries for "[p]utting courts into politics, and compelling judges to become politicians," arguing that "in many jurisdictions [judicial elections] ha[d] almost destroyed the traditional respect for the bench."  *See id.* (quoting Roscoe Pound, *The Causes of Popular Dissatisfaction with the Administration of Justice*, 46 J. Am. Jud. Soc'y 55, 66 (1962) (hereinafter "Pound").  In 1913, William Howard Taft "severely criticized both partisan and non-partisan election and urged a return to the appointive system."  *Id.* at 65 (citing William H. Taft, *The Selection and Tenure of Judges*, 36 Annual Rep. A.B.A. 418 (1913)).

In 1914, a Northwestern University law professor, Albert M. Kales, proposed a system in

which judges would be: (1) nominated by "a group of knowledgeable people"; (2) appointed by a popularly-elected official; and (3) retained in office subject to periodic non-competitive elections. *See id*. at 67; *id*. at 65 (citing Albert M. Kales, UNPOPULAR GOVERNMENT IN THE UNITED STATES (1914) (hereinafter "Kales")). In 1940, Missouri was the first state to adopt a judicial selection and retention system that included these three basic elements. *See id*. at 71. Therefore, some commentators have referred to other judicial selection systems that share these three basic elements as following the "Missouri Plan."[4] *See id*.

Generally, in judicial selection systems following the Missouri Plan, "some portion of the membership [of the nominating commission] is made up of attorneys, while others are selected from the general public. In most systems, the governor, legislature, state bar association, and, sometimes, the chief justice appoint some proportion of the nominating commission's membership." Mark A. Behrens & Cary Silverman, *The Case for Adopting Appointive Judicial Selection Systems for State Court Judges*, 11 Cornell J.L. & Pub. Pol'y 273, 301 (2002) (hereinafter "Behrens"). However, beyond these basic elements, there is "great variance between the [judicial] selection systems of the states" that follow the Missouri Plan. *See id*.; *see also* Caufield at 171 ("It is important to note that there is no one merit selection system.").

### B. *Iowa's Implementation of the Missouri Plan*

Iowa became a state in 1846, during the period in which a number of states discarded their old appointive systems and decided to select judges by popular election. *See generally* Uhlenhopp at 52–53. Therefore, it is not surprising that the framers of the Iowa Constitution "hotly debated" the issue of whether or not Iowa judges should be directly elected. *See id*. at 53

---

[4]     This general type of system has also been referred to as the "Merit Plan," the "American Bar Association Plan," and the "Kales Plan." Winters at 63.

n.154.  When the original Iowa Constitution was adopted in 1846, it reflected a sort of

compromise between those who favored direct, popular elections and those who did not.  The

1846 Constitution provided that district court judges would be selected by popular election but

that supreme court justices would be elected by the state general assembly.  *See* Iowa Const., art.

V, §§ 3, 4 (1846).  This distinction did not last long, however.  In 1857, Iowa adopted a new

constitution that provided for the popular election of all state judges.  *Id*., art. V, §§ 3, 5 (1857).

Iowa continued to elect its judges for over one hundred years.  In the 1950s, however,

momentum began building for change.  In 1957, one commentator noted that "Iowa . . . persists

in the popular election of all members of the judiciary system, from the supreme court to the

justice of the peace," and suggested that an appointive system would "elevate the quality of the

members of the bench . . . ."  *See* Uhlenhopp at 54–55 n.160 (quoting Russell Marion Ross, THE

GOVERNMENT AND ADMINISTRATION OF IOWA 356 (1957)).  In 1958, an Iowa "district court

judge proposed to change the procedure for judicial selection" in an *Iowa Law Review* article.

*See* Opinion No. 94-7-2(L), 1994 WL 470468, at *1 (Iowa A.G. July 1, 1994) (citing Uhlenhopp

at 54, 65–66).

In that article, Judge Harvey Uhlenhopp[5] called for, among other things, a "return to a

nonpolitical judiciary."  Uhlenhopp at 11.  Judge Uhlenhopp argued that, in order to promote

justice, judges must be "beholden to no one."  *Id*. at 51.  He also argued, in a judicial selection

system, "[t]he objective is to secure the best qualified individual for judge who is available.

Hence, the choice must be made intelligently."  *Id*. at 54.  But, according to Judge Uhlenhopp:

---

[5]      Judge Uhlenhopp was a district court judge from 1953 until 1970, when he was
appointed to the Iowa Supreme Court.  IOWA OFFICIAL REGISTER 108 (L. Dale Ahern, ed.)
(Fifty-Fourth Number, 1971–1972).

The trouble with the elective method is that this essential [of intelligent choice] is almost entirely lacking. Popular election, rather than careful selection, is a poor way to fill posts involving professional qualifications. The people have little opportunity to study the training, experience, and character of the various lawyers who want to be judge. . . . The people . . . should only be called upon to select policy makers, such as the chief executive of the legislators. The people can and will learn how those candidates stand on the issues. But voters are not prepared for the choices they must make when they are asked to pick department heads, railroad commissioners, judges, and whatnot. . . . The people should decide between candidates who establish broad programs, but judges do not function in that area. We might as well pick our school teachers and highway engineers at the polls.

*Id*. at 54–56 (footnotes omitted).

Judge Uhlenhopp argued that Iowa's elective system also had "four side effects," namely: (1) discouraging talented lawyers from seeking judicial office; (2) preventing talented lawyers from becoming judges if they belonged to the minority political party; (3) discouraging judges from firmly managing their dockets for fear of offending powerful lawyers; and (4) and inviting "the loss of public confidence which results from politics in the courts." *Id*. at 58–62.

Judge Uhlenhopp proposed that Iowa adopt a version of the Missouri Plan. *See id*. at 65 (arguing that "[n]o system is perfect, but students of the subject generally agree that the best selection system yet devised is the one conceived by Albert Kales in 1914 . . . ."). Specifically, Judge Uhlenhopp proposed that:

In Iowa, there would be a statewide commission for the supreme court, and a separate commission in each district . . . . These commissions would have an important function, and they should be carefully composed. The governor on behalf of the public should select some of the members of each commission. The lawyers have special knowledge which is of value and they should select some of the commissioners, but not a controlling number. Judges too have valuable knowledge concerning candidates' qualifications. Hence the chief justice should serve on the state commission, and he should be its chairman. . . . Except for the judicial members, there should be no restriction respecting the occupation of commissioners . . . . They should be electors of the area in question, but their political affiliation should be disregarded.

*Id.* at 65–67 (footnotes omitted).  Judge Uhlenhopp noted that a number of states had already adopted or proposed similar judicial selection systems, including Alaska and Kansas.  *Id.* at 66 n.194.

Judge Uhlenhopp argued that once selected, all appellate judges and supreme court justices should have life tenure, subject only to good behavior.  *See id.* at 68.  According to Judge Uhlenhopp, such a system would not only attract the best legal talent, but also "assure the State of a supreme court free to render right though temporarily unpopular opinions."  *Id.*  For trial courts, however, Judge Uhlenhopp recommended that the judges serve subject to periodic retention elections.  *See id.* at 69.  According to Judge Uhlenhopp, retention elections would provide a "practical compromise" between the competing interests of judicial independence and judicial accountability.  *See id.* at 71.

In 1959, the Iowa Legislature passed a joint resolution proposing to amend the Iowa Constitution to replace Iowa's elective judicial system with an appointive system.  *See* Iowa Official Register 484 n.47 (Edward F. Mason, ed.) (Fiftieth Number, 1963–1964) (hereinafter "Register").  The proposed amendment resembled Judge Uhlenhopp's proposal, providing that all state judges would be nominated by a commission, appointed by the Governor, and retained subject to periodic retention elections.  *See id.* at 484–85.  The proposed amendment was readopted by the Legislature in 1961 and put on the ballot for consideration by voters in 1962.  *See id.* at 484 n.47.  On June 4, 1962, the people of Iowa voted to adopt the amendment.  *See id.*; *see also* Br. in Supp. of Mot. to Dismiss (hereinafter "Defs.' Br.") at 2–3 (Clerk's No. 10-1).

The judicial selection and retention system adopted by the people of Iowa in 1962 remains in place to this day.  Under this system, whenever there is a vacancy on the Iowa

Supreme Court or the Iowa Court of Appeals, the State Judicial Nominating Commission (hereinafter the "Commission") must accept applications and create a list of three nominees for each vacancy. *See* Iowa Const., art. V, §§ 15, 16; *see also* Iowa Code §§ 46.14. The Governor then appoints a nominee from that list. *See* Iowa Const., art. V, § 15. If the Governor does not appoint a judge within 30 days, the Chief Justice of the Iowa Supreme Court must select one of the Commission's nominees to fill the vacancy. *See id*.

Once the Governor appoints a judge, that judge "serve[s] for one year after appointment and until the first day of January following the next judicial election after the expiration of such year." Iowa Const. Art. V, § 17. At that point, the new judge must stand for retention. *See id*. In a retention election, voters are asked to vote "yes" or "no" on the issue of whether the judge should be retained. *See id*. If the judge receives a majority of "yes" votes, the judge then serves a full term. *See id*. At the end of that full term, the judge must again stand for retention.

The Commission is currently comprised of 15 members, seven of whom were appointed (hereinafter the "Appointive Members") and seven of whom were elected by members of the Iowa Bar (hereinafter the "Elective Members"). *See* Compl. ¶ 26. The final member, and chair, of the Commission is the Iowa Supreme Court justice "who is senior in length of service on said court, other than the chief justice . . . ." Iowa Const., art. V, § 16.

C. *Current Vacancies on the Iowa Supreme Court*

On November 2, 2010, three Iowa Supreme Court justices stood for retention and were not retained. *See* Compl. ¶ 34. Therefore, their terms ended on January 1, 2011, leaving three vacancies on the Iowa Supreme Court. *See id*. The Commission accepted applications to fill those vacancies through January 14, 2011 and is currently evaluating those applications. *See*

Hr'g Tr. 44:18–19.[6]

D.  *The Parties*

The Plaintiffs are all citizens of Iowa and are all registered to vote in Iowa.  Compl. ¶¶

7–10.  The Defendants are the State Court Administrator and the current members of the

Commission, all named in their official capacities.  *Id.* ¶¶ 11, 14, 17, 21.

## II. LEGAL STANDARDS

A.  *Standard for Motions to Dismiss*

Defendants seek to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  Mot. to Dismiss at 1.  Defendants' arguments regarding Rule

12(b)(1) are limited to a facial attack on Plaintiffs' complaint.  *See id.*  "A motion to dismiss for

lack of jurisdiction under Rule 12(b)(1) which is limited to a facial attack on the pleadings is

subject to the same standard as a motion brought under Rule 12(b)(6)."  *Mattes v. ABC Plastics,*

*Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6

(8th Cir. 1990)).

"A motion to dismiss under Rule 12(b)(6) is the usual and proper method of testing the

legal sufficiency of the complaint."  *Peck v. Hoff*, 660 F.2d 371, 374 (8th Cir. 1981); *see also*

*Helgoth v. Larkins*, No. 4:09-CV-1880, 2010 WL 1936196, at *2 (E.D. Mo. May 12, 2010).

Rule 12(b)(6) allows the Court "to eliminate actions that are fatally flawed in their legal

premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and

trial activity."  *See Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157,

1160 (Fed. Cir. 1993) (citing *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989)).

---

[6]     All citations to the hearing transcript refer to the rough draft provided to the Court
by the court reporter.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a complaint, a court must "accept as true all of the factual allegations contained in the complaint," and must draw "all reasonable inferences . . . in favor of the plaintiff," *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555–60), but need not accept any legal conclusions contained in the complaint, *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2001). Thus, "[a] complaint may be dismissed as a matter of law if it lacks a cognizable legal theory or states insufficient facts under a cognizable legal theory." *Serrano v. Security Nat'l Mortg. Co.*, No. 09-CV-1416, 2009 WL 2524528, at *1 (S.D. Cal. Aug. 14, 2009) (slip copy) (citing *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984)); *see also In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 790 (8th Cir. 2010) ("Dismissal is proper when the complaint fails to state a claim upon which relief can be granted." (quoting *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1049 (8th Cir. 2010))).

### B. *Standard for Motions for Preliminary Relief*

In their motion, Plaintiffs request both a temporary restraining order and a preliminary injunction. The test for both of these forms of preliminary relief involves consideration of four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties and litigants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc); *see also*

*Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 369 n.1 (8th Cir. 1991) (describing the *Dataphase* factors as "the factors governing preliminary relief in the Eighth Circuit").

Plaintiffs have the burden of showing that preliminary relief should be granted. *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc)). Because Plaintiffs seek to enjoin the enforcement of state statutes, they must "demonstrate more than just a 'fair chance' that they will succeed on the merits." *See Planned Parenthood of Minn. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc). Instead, Plaintiffs must meet a more rigorous standard, demonstrating that they are "likely to prevail on the merits." *Id*. at 732 (quoting *Doran v. Salem Inn, Inc*., 422 U.S. 922, 931 (1975)). This more "rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" *Id*. (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). The Eighth Circuit has stated that "[b]y re-emphasizing this more rigorous standard for demonstrating a likelihood of success on the merits in these cases, we hope to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id*. at 733. The Court has no doubt that this exhortation to apply "an appropriately deferential analysis" applies with at least equal—if not greater—force where, as here, Plaintiffs seek to enjoin enforcement of not just a state statute, but a provision of a state constitution.

## III.  ANALYSIS

### A.  *Defendants' Motion to Dismiss*

Defendants argue that Plaintiffs' case should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because Plaintiffs lack standing and have failed to state a claim upon which relief can be granted.  Mot. to Dismiss at 1–2.  The Court will consider each of these arguments in turn.

First, Defendants argue that Plaintiffs have failed to allege that they have or will suffer any harm that is distinct from that allegedly suffered by the public at large and, therefore, lack Article III standing.  *See* Mot. to Dismiss at 1; *see also* Defs.' Resistance to Pls.' Mot. for TRO/Prelim. Inj. (hereinafter "Defs.' PI Br.") at 4 n.1 (Clerk's No. 31) (citing *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 899 (8th Cir. 2008)).  Plaintiffs argue that they are not required to allege that they suffer a harm not suffered by other qualified Iowa voters, pointing to the Supreme Court's opinion in *Gray v. Sanders*.  Pls.' Resp. to Defs.' Mot. to Dismiss (hereinafter "Pls.' Br.") at 2 (Clerk's No. 32) (citing 372 U.S. 368, 375 (1963)).

In *Gray*, the Supreme Court stated that the "appellee, like any person whose right to vote is impaired, has standing to sue."  372 U.S. at 375 (internal citations omitted).  As Defendants point out, this standard appears to be somewhat circular to the extent that it bases Plaintiffs' standing on the validity of Plaintiffs' claim.  Hr'g Tr. 31:23–25.  Nonetheless, the Court concludes that, under *Gray*, Plaintiffs' allegation that they have been denied the right to vote is sufficient to satisfy the injury in fact requirement of Article III.  *See* Compl. ¶ 89.  Therefore, Plaintiffs have alleged a sufficient injury and have standing to bring Count 2.

However, in Count 1 of their complaint, Plaintiffs do not allege that they have been denied the right to vote.  *See id.* at 8 (alleging a violation of the "Right to Equal Participation in the Selection of Judicial Officials"); *see also* Hr'g Tr. 18:6-15 (distinguishing the two claims);

*id.* 48:8–13 (same).  Therefore, *Gray* does not apply directly to Count 1.  However, Count 1 alleges that Plaintiffs have suffered a violation of their constitutional rights and appears to be premised, at least in part, upon Plaintiffs' asserted right to vote.  *See* Compl. ¶¶ 46–47, 59–60. Additionally, the Court is mindful of the fact that it "must construe the complaint in favor of the complaining party."  *Gardner v. First Am. Title Ins. Co.*, 294 F.3d 991, 993 (8th Cir. 2002) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).  Therefore, Plaintiffs have alleged a sufficient injury and have standing to bring Count 1.

Second, Defendants argue that Plaintiffs have failed to state a claim for which relief may be granted.  Mot. to Dismiss at 2.  Defendants argue that Plaintiffs' claims are "so fatally flawed in their legal premises that the complaint fails to state a plausible claim for relief against any Defendant."  *Id.*  Defendants also argue that "[o]ther federal courts have consistently and without exception rejected challenges to merit selection of state judges."  Defs.' Br. at 4 (citing *Kirk v. Carpenti*, 623 F.3d 889 (9th Cir. 2010); *Dool v. Burke*, No. 10-1286, 2010 WL 4568993 (D. Kan. Nov. 3, 2010) (slip opinion); *Bradley v. Work*, 916 F. Supp. 1446 (S.D. Ind. 1996), *aff'd on other grounds*, 154 F.3d 704 (7th Cir. 1998); *African-American Voting Rights Legal Defense Fund, Inc. v. Missouri*, 994 F. Supp. 1105 (E.D. Mo. 1997), *aff'd per curiam*, 133 F.3d 921 (8th Cir. 1998) (hereinafter "*AAVRLDF*"); *see also* Defs.' PI Br. at 2 (noting that both *Kirk* and *Dool* were dismissed for failure to state a claim).

In this lawsuit, brought pursuant to 42 U.S.C. § 1983, Plaintiffs allege that "their Equal Protection rights are violated because they are excluded from participating in the elections of the Elective Members of the Commission."  Pls.' Br. at 2.  Therefore, they "ask this court to stop the elections from which they are excluded and also end the terms of the current" Elective Members

"so that they cannot participate in the process of making nominations to fill the current vacancies." *See id.* Specifically, Plaintiffs request that the Court preliminarily and permanently enjoin "enforcement and execution" of Article V, Section 16 of the Iowa Constitution and Iowa Code §§ 46.2, 46.4, 46.5, 46.7, 46.8, 46.9, 46.9A, 46.10 and 46.14. Compl. at 15–16. Plaintiffs allege that the challenged provisions violate two fundamental rights, a "right to equal participation in the selection of judicial officials" and a "right to vote" for the Elective Members.[7] The Court will address each of Plaintiffs' asserted rights in turn.

1. *"Right to equal participation in the selection of judicial officials."*

In Count 1 of their complaint, Plaintiffs invoke a Fourteenth Amendment "right to equal participation in the selection of judicial officials." Compl. at 8; *see also id.* ¶ 18. Specifically, Plaintiffs allege that because they are not allowed to vote for the Elective Members of the Commission, the challenged provisions violate their "right to equal participation in the selection of Justices of the Iowa Supreme Court . . . ." *Id.* ¶ 2. According to Plaintiffs, under Iowa's judicial selection system, they have "substantially less influence over who is nominated to become an Iowa Supreme Court justice or Court of Appeals judge," as compared to members of the Iowa Bar, and that this "violates Plaintiffs' Equal Protection rights . . . ." *Id.* ¶¶ 60, 81. Plaintiffs aver that "[w]hile the appointment of officials may make the influence of each voter *indirect*, this is constitutional when the official making the appointment is 'elected consistent with the commands of the Equal Protection Clause,' thereby ensuring that each voter's influence

---

[7]     Plaintiffs insist that these are two distinct rights. Hr'g Tr. 18:10–15, 48:6–7 ("[W]e are bringing two distinct counts that aren't—they aren't necessarily dependent upon each other."). However, Plaintiffs do not meaningfully distinguish between these two Fourteenth Amendment "rights" in their briefs. *E.g.*, Pls.' PI Br. at 4–14. Therefore, the Court has attempted to understand the distinctions between and the legal bases for Plaintiffs' asserted rights by referring to Plaintiffs' complaint.

is *equal* to that of other citizens."[8]  *Id.* ¶ 53 (quoting *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 n.7 (1969)).

At the hearing, Plaintiffs' counsel conceded that no federal court has recognized the "right to equal participation" that Plaintiffs assert in this case.  *See* Hr'g Tr. 24:18–25:1.  Indeed, within the past four months, two federal courts have rejected this claim, based on essentially identical arguments.  *See Kirk*, 623 F.3d at 898 (involving a challenge to Alaska's judicial selection system); *Dool*, 2010 WL 4568993, at *6 (involving a challenge to Kansas' judicial selection system).

Nonetheless, Plaintiffs contend that this right is "implicit in *Kramer*."[9]  Hr'g Tr. 22:18–20.  In support of this proposition, Plaintiffs point to a single footnote of dicta in *Kramer*.  *See* Compl. ¶ 53 (citing *Kramer*, 395 U.S. at 627 n.7).  That footnote states, in full:

> Of course, the effectiveness of any citizen's voice in governmental affairs can be determined only in relationship to the power of other citizens' votes.  For example,

---

[8]  The Court rejects Plaintiffs' suggestion that all judges—or at least, all participants in the judicial selection process—be either popularly elected or appointed by a popularly elected official with unfettered discretion in selecting candidates.  *See* Compl. ¶ 53; *see also* Hr'g Tr. 24:6–9 (arguing that the current Iowa system is constitutionally deficient because the Governor does not have unfettered discretion in selecting candidates for the judiciary).  The Court has found no cases that support—let alone establish—this broad proposition.  To the contrary, the two other federal courts that have considered this proposition have rejected it.  *See Kirk*, 623 F.3d at 896; *Dool*, 2010 WL 4568993, at *6.

[9]  At the hearing, Plaintiffs also averred, without explanation or elaboration, that this right is "contemplated in . . . *Sailors*."  Hr'g Tr. 21:4–5 (referring, apparently to *Sailors v. Bd. of Educ. of Kent Cnty.*, 387 U.S. 105 (1967)).  The Court does not agree.  Although the appointive system upheld in *Sailors* conformed with Plaintiffs' preferred model (*see* Footnote 8 of this Opinion) because the appointments were made by popularly-elected officials, nothing in *Sailors* indicates that the appointive system upheld in that case is the only constitutionally-permissible system.  To the contrary, in *Sailors*, the Supreme Court recognized the value of local experimentation and innovation.  *See* 387 U.S. at 110–11.  Moreover, nothing in *Sailors* indicated that the Supreme Court meant to create a new substantive right of the type advanced by Plaintiffs in Count 1.

if school board members are appointed by the [mayor], the district residents may effect a change in the board's membership or policies through their votes for the mayor. Each resident's formal influence is perhaps indirect, but it is equal to that of other residents. However, when the school board positions are filled by election and some otherwise qualified city electors are precluded from voting, the excluded residents, when compared to the franchised residents, no longer have an effective voice in school affairs. This is precisely the situation with regard to the size of the school budget in districts where [the statute at issue] applies.

*Kramer*, 395 U.S. at 627 n.7 (internal citation omitted).

Based upon this footnote, Plaintiffs conclude that there is an "implicit" right guaranteeing that "each citizen . . . be given an equal voice in the selection of public officials, however indirect that voice might be." *See* Compl. ¶ 53. The Court does not agree. Even if this footnote could be read as establishing some controlling principle, that principle was announced in a very different context than the one presented here. In *Kramer*, the Supreme Court considered the right to vote in the context of a local school board, a representative body that exercised legislative powers that directly affected the residents of the school district. *See Kramer*, 395 U.S. at 624. Although the Supreme Court indicated in *Kramer* that its rationale would apply to equal force to executives with "broad administrative powers," *see id*. at 629, nothing in *Kramer* suggests that the Supreme Court meant to create an entirely new, substantive Fourteenth Amendment right to equal influence in the selection of any person who might, in any sense, be deemed a "public official," including state court judges. *See* Compl. ¶ 53; *see also id*. ¶ 2. Therefore, the Court concludes that the right Plaintiffs assert in Count 1 is not "implicit in *Kramer*."

Additionally, Plaintiffs ignore the fact that the Supreme Court's decision in *Kramer* was premised on the concept of representative democracy. *See* 395 U.S. at 626. As the three-judge court recognized in *Wells v. Edwards*, "[t]he State judiciary, unlike the legislature, is not the

organ responsible for achieving representative government."  347 F. Supp. 453, 456 (M.D. La.

1972), *aff'd mem.*, 409 U.S. 1095 (1973) (quoting *N.Y. State Ass'n of Trial Lawyers v.*

*Rockefeller*, 267 F. Supp. 148, 153 (S.D.N.Y. 1967)).  Unlike legislators and executives,

"[j]udges do not represent people, they serve people."  *See id.* (quoting *Buchanan v. Rhodes*, 249

F. Supp. 860, 865 (N.D. Ohio 1960)); *see also Carey v. Wolnitzek*, 614 F.3d 189, 193 (6th Cir.

2010) ("Judges do not represent constituents. They apply the law to the facts one case at a time,

and, if they represent anyone or anything, it is the rule of law, which is why they sometimes must

rule against the policy preferences of a majority of the voters."); Caufield at 164 ("Unlike

officials in the legislative and executive branches, who are meant to be the representatives of the

people, judges occupy a unique position in that they are responsible to the law.").  Therefore, the

particular concerns regarding representative government that animated the Supreme Court's

decision in *Kramer* are not implicated by the selection of state court judges.[10]  But to the extent

those concerns are relevant in this context, the fact remains that the Governor—a popularly-

elected official—has the ultimate power to appoint judges.

At base, Plaintiffs are asking this Court to recognize an entirely new substantive

Fourteenth Amendment right.  The Court declines Plaintiffs' invitation to do so.  It not the

business of the federal courts "to create substantive constitutional rights in the name of

guaranteeing equal protection of the laws."  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411

U.S. 1, 33 (1973).  That is especially true, where, as here, Plaintiffs have failed to provide

---

[10]     To be clear, the Court is not to saying that there are no constitutional constraints
upon how states may select their judiciaries and is not expressing any opinion on the relevant
rules that would apply to direct elections of judges.  Rather, the Court seeks to provide context
for the broad statements in *Kramer*—and its progeny—that Plaintiffs have cobbled together in
order to construct their case.

adequate legal support for their asserted "right to equal participation."  The Court concludes that Plaintiffs do not have a right, let alone a fundamental right, to "equal participation" in the selection of state court judges—at least not as that "right" is conceptualized by Plaintiffs. Because it is not based on a cognizable legal theory, Count 1 fails to state a claim for which relief may be granted.

2.      *"Right to vote."*

a.  *Determination of the proper standard of review.*

In Count 2 of their complaint, Plaintiffs allege that the challenged provisions violate a fundamental right—specifically, their right to vote for the Elective Members.[11]  *See* Compl. ¶ 89; *see also id*. at ¶ 2.  Therefore, Plaintiffs assert that the challenged provisions are subject to strict scrutiny.

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause does not, of course, require that the State never distinguish between citizens, but only that the distinctions that are made not be arbitrary or invidious."  *Avery v. Midland Cnty.*, 390 U.S. 474, 484 (1968). The Supreme Court has "treated as presumptively invidious those classifications that

---

[11]      Defendants argue that while "the equal protection doctrine is relevant to the definition of the franchise for purpose of the direct public election of public officials," this case does not present such a situation.  Defs.' Br. at 3.  Rather, according to Defendants, "[h]ere, we have only a nomination process preparatory to an appointment by the Governor, not a popular election."  *Id*.  This argument has some force vis-à-vis Plaintiffs' claim in Count 1; however, it is not particularly relevant to the resolution of Plaintiffs' claim in Count 2.  In Count 2, Plaintiffs are not challenging the way the Commission nominates candidates; rather, they argue the selection of the Elective Members *is* a direct public election of public officials.  *See* Pls.' Br. at 4.

disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'"
*Plyler v. Doe*, 457 U.S. 202, 216–17 (1982).  Therefore, if a classification "impermissibly
interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a
suspect class," the Court must analyze that classification using strict scrutiny.  *See Mass. Bd. of
Retirement v. Murgia,* 427 U.S. 307, 312 (1976) (footnote omitted).

If, however, a classification does not impermissibly interfere with the exercise of a
fundamental right or involve a suspect class, then "judicial scrutiny under the Equal Protection
Clause demands only a conceivable rational basis for the challenged state distinction."
*Nordlinger v. Hahn*, 505 U.S. 1, 27 (1992) (Thomas, J., concurring).  If this rational basis
standard applies, then "the burden is upon the challenging party to negative any reasonably
conceivable state of facts that could provide a rational basis for the classification."  *Bd. of
Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (citing *Heller v. Doe*, 509 U.S.
312, 320 (1993)).

As framed by Plaintiffs, the "sole question" the Court must decide is whether the election
of the Elective Members is an "election of general interest" or a "limited election," as those
concepts have been developed in *Kramer* and its progeny.  *See* Hr'g Tr. 7:25–8:3.  The line of
cases upon which Plaintiffs rely began with the Supreme Court's landmark decision in *Reynolds
v. Sims*.  In *Reynolds*, the Court recognized a constitutional right to vote and held "that, as a
basic constitutional standard, the Equal Protection Clause requires that the seats in both houses
of a bicameral state legislature must be apportioned on a population basis."  377 U.S. 533, 554,
568 [1964].  This holding was based upon the proposition that "[a]s long as ours is a
representative form of government, and our legislatures are those instruments of government

elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." *Id*. at 562.

> Since *Reynolds*, the Court has applied the "one person, one vote" principle in a line of cases concerning various types of elections in which the franchise has been selectively distributed, including junior college trustee elections, [*id*.,] school district board elections, [*Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-27, 632 (1969),] and revenue bond elections[, *Cipriano v. Houma*, 395 U.S. 701, 705-06 (1969)].

*Miller v. Carpeneti*, No. 3:09-cv-136, slip op. at 13 (D. Alaska Sept. 15, 2009), *aff'd sub nom.*

*Kirk v. Carpeneti*, 623 F.3d 889 (9th Cir. 2010) (hereinafter "*Carpeneti*") (bracketed material appeared in footnotes in the original).

This "one person, one vote" rule has been summarized as follows: "[W]henever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election . . . ." *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 56 (1970). There is also an exception to this rule. As one court recently explained:

> One exception to the "one person, one vote" rule—the "limited purpose exception"—dictates that the rule does not apply to the election of a governmental entity that (1) exercises only narrow, limited governmental powers, and (2) conducts activities that disproportionately affect only a specific group of individuals. [*See Ball v. James*, 451 U.S. 355, 363-72 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 731 (1973); *Hadley*, 397 U.S. at 56.]

*Carpeneti*, No. 3:09-cv-136, slip op. at 13 (bracketed material appeared in footnotes in the original). The Court will refer to this exception to the "one person, one vote" rule as the "*Ball-Salyer* exception."

However, despite Plaintiffs' eagerness to proceed straight to a determination of the

applicability of the "one person, one vote" rule, this Court finds that this case presents a more basic, threshold issue—whether or not the Plaintiffs have a constitutional right to vote for the Elective Members in the first place.[12]

I.     *Do Plaintiffs have a constitutional right to vote for the Elective Members?*

Plaintiffs aver that they "have the right to vote for officials who exercise government power affecting them."  *See* Compl. ¶ 83 (citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) and *Hellebust v. Brownback*, 42 F.3d 1331, 1333 (10th Cir. 1994)); *see also id.* ¶ 89 (arguing that Plaintiffs' rights have been violated because the election of the Elective Members is "an election that affects them" (citing *Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1970)).  However, neither of the Supreme Court cases Plaintiffs rely upon state such a test.[13]  In *Reynolds*, the Supreme Court stated that "[u]ndeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections," but limited its holding to elections for legislators.  *Reynolds*, 377 U.S. at 554, 568.  In *Phoenix*, the Supreme Court did not hold, as Plaintiffs suggest, that all qualified voters have a right to vote in any election that

---

[12]     The Court is aware that other courts have not engaged in this type of threshold analysis in similar cases.  *E.g.*, *Dool*, 2010 WL 4568993, at *2.  However, the Court cannot ignore the fact that the strict scrutiny presumption enunciated in *Reynolds* is premised on the existence of a fundamental right to vote.  *See Reynolds*, 377 U.S. at 562.  Additionally, because the "one person, one vote" rule carries a presumption of invalidity, if the Court were to apply that rule without first determining that Plaintiffs have a fundamental right to vote in the elections at issue, the Court would risk, in effect, creating a right to vote where none actually exists.  *Cf. Snead v. City of Albuquerque*, 663 F. Supp. 1084, 1087 (D.N.M. 1987) ("[T]o implicate the higher standard of review on the basis of a 'fundamental right' requires that the right be guaranteed by the Constitution.").

[13]     Even if *Hellebust* could be fairly read to state such a proposition, *Hellebust* is neither binding nor persuasive authority and is, in any case, both legally and factually distinguishable from this case.  *See Dool*, 2010 WL 4568993, at *2 (distinguishing *Hellebust* in a nearly identical challenge to Kansas' judicial selection system).

"affects them."  *See* Compl. ¶ 89.  Rather, in *Phoenix*, the Supreme Court merely stated that,

"[p]resumptively, when all citizens are affected in important ways by a *governmental decision*

*subject to a referendum*, the Constitution does not permit weighted voting or the exclusion of

otherwise qualified citizens from the franchise."  *Phoenix*, 399 U.S. at 209 (emphasis added).

Indeed, it appears that Plaintiffs' proffered "test" is simply an inversion of the *Ball-*

*Salyer* exception to the "one person, one vote" rule.  In effect, Plaintiffs are arguing that all state

elections must be evaluated using a strict dichotomy—the election must either satisfy the *Ball-*

*Salyer* exception, and thus qualify as a "special election," or it will be deemed a "general

election" subject to the "one person, one vote" rule, as enunciated and applied in *Kramer*.[14]  *See*,

*e.g.*, Hr'g Tr. at 9:13–15; *see also* Pls.' PI Br. at 5.  The basic logical problem with this

proposition is obvious—one cannot prove that a rule applies by proving that its exception does

not apply.  Moreover, Plaintiffs' arguments seem to ignore the scope of the fundamental right to

vote.

"[T]he right to vote, per se, is not a constitutionally protected right."  *San Antonio*, 411

U.S. at 36 n.78; *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) ("[T]his

Court has often noted that the Constitution 'does not confer the right of suffrage upon any one .

. . .'" (quoting *Minor v. Happersett*, 21 Wall. 162, 178 (1875)).  There is, however, a "protected

right, implicit in our constitutional system, to participate in state elections on an equal basis with

---

[14]    The Supreme Court did not actually used the phrase "election of general interest"
in *Kramer.  See* 395 U.S. 621.  Indeed, in *Cipriano*, a case decided on the same day as *Kramer*,
the Supreme Court characterized the rule in *Kramer* as one pertaining to "a limited purpose
election."  *See Cipriano*, 395 U.S. at 704.  In 1975, however, the Supreme Court characterized
*Kramer* as follows:  "In *Kramer* . . . we held that in an *election of general interest*, restrictions on
the franchise other than residence, age, and citizenship must promote a compelling state interest
in order to survive constitutional attack."  *Hill v. Stone*, 421 U.S. 289, 29 (1975) (emphasis
added).

other qualified voters whenever the State has adopted an elective process *for determining who will represent any segment of the State's population*." *San Antonio*, 411 U.S. at 36 n.78 (emphasis added). This is the fundamental "right to vote" established by *Reynolds* and its progeny. *See id*. at 59 n.2 (Stewart, J., concurring) (citing *Reynolds*, 377 U.S. 533; *Kramer*, 395 U.S. 621; and *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Lubin v. Panish*, 415 U.S. 709, 713–14 (1974); *see also generally AAVRDLF*, 994 F. Supp. at 1127 ("[T]here is no fundamental right of every citizen to vote in every election which happens to take place in Missouri."). Therefore, the key issue in this case is whether the Elective Members "represent any segment of the State's population." *See San Antonio*, 411 U.S. at 36 n.78.

The Supreme Court did not explain in *San Antonio* what it means to "represent any segment of the State's population." *See id*. However, the fundamental right to vote is grounded in the concept of representative democracy. *See Reynolds*, 377 U.S. at 562; *see also id*. at 555 ("The right to vote freely for the candidate of one's choice is of [*sic*] the essence of a democratic society, and any restrictions on that right strike at the heart of representative democracy."). Thus, *Reynolds* and its progeny are "based on the propositions that in this country the people govern themselves through their elected representatives and that 'each and every citizen has an inalienable right to full and effective participation in the political processes' of the legislative bodies of the Nation, State, or locality as the case may be." *Bd. of Estimate of N.Y. v. Morris*, 489 U.S. 688, 693 (1989) (quoting *Reynolds*, 377 U.S. at 565). This concept of representative government includes elected executive officials as well as legislative officials. *See Kramer*, 395 U.S. at 629–30; *see also Republican Party of Minn. v. White*, 536 U.S. 765, 805 (2002) (Ginsburg, J. dissenting) ("Legislative and executive officials serve in representative capacities.

-23-

They are agents of the people; their primary function is to advance the interests of their constituencies.")  Therefore, the Court concludes that persons who "represent any segment of the State's population" are those who are "representative in the sense of reflecting or responding to the views of a public."  *See* G. Alan Tarr, *Designing an Appointive System: The Key Issues*, 34 Fordham Urb. L.J. 291, 302 (2007) (hereinafter "Tarr").

The Elective Members "have no constituencies, so they are not representative in the sense of reflecting or responding to the views of a public."  *See id.*  Instead, the Elective Members provide legal expertise to the Commission's nomination process.  *See id.* at 302 ("The [nominating] commission's job is quality control.  It should ensure that the selecting authority chooses only from qualified candidates.").  In this function, the Elective Members do not *represent* the people of Iowa, they *serve* the people of Iowa.[15]  *Cf. Wells*, 347 F. Supp. at 455 (quoting *Buchanan*, 249 F. Supp. at 865).  Therefore, the Court concludes that the Elective Members do not "represent any segment of the State's population."  *See San Antonio*, 411 U.S. at 36 n.78.

Because the Elective Members are not representatives in the relevant sense, Iowa voters do not have a constitutional right to vote for them.  *See id.*; *see also AAVRLDF*, 994 F. Supp. at 1127 ("Missouri's practice of permitting lawyers to elect the lawyers on the nominating commissions does not interfere with the exercise of a fundamental right . . . .").  The mere fact that the people of Iowa decided to grant members of the Iowa Bar the ability to vote for the Elective Members does not, as Plaintiffs suggest, somehow magically vest Plaintiffs with a

---

[15]    Indeed, the Elective Members, like the Appointive Members, must be "chosen without reference to political affiliation," a requirement that would make no sense if the Commission was supposed to be comprised of politically responsive officials.  *See* Iowa Const., art. 5, § 16.

constitutional *right* to vote in that election. *Cf. Snead*, 663 F. Supp. at 1087 ("Because the

Plaintiffs in this case have no constitutionally protected right to vote in the city's elections, the

mere fact that the New Mexico law extends the right to vote to [others who do not have a

constitutional right to vote in those elections] does not implicate strict scrutiny by this Court of

the provisions."). For all of these reasons, the Court concludes that the challenged provisions do

not implicate Plaintiffs' fundamental right to vote. Therefore, the challenged provisions do not

trigger strict scrutiny, but are subject only to rational basis review.

The Court notes that this conclusion is not inconsistent with *Kramer* or its progeny,

despite the sometimes broad statements made in some of those cases. Indeed, the main cases

upon which Plaintiffs rely involved direct elections for representatives who had the power to

exercise governmental powers directly over some segment of the state's population.[16] *See Ball*,

451 U.S. at 357 (directors of a water reclamation district); *Salyer*, 410 U.S. at 724–25 (directors

of a water storage district); *Hadley*, 397 U.S. at 51–52 (junior college trustees); *Kramer*, 395

U.S. at 622 (school board members); *Little Thunder v. South Dakota*, 518 F.2d 1253, 1254 (8th

Cir. 1975) (various county officials); *Hellebust*, 42 F.3d at 1332 (members of the Kansas State

Board of Agriculture). The Elective Members are not, as discussed above, representatives in this

sense. They do not directly govern the affairs of any segment of the population of Iowa. *Cf.*

*Little Thunder*, 518 F.2d at 1256 (concluding that residents "possess a substantial interest in the

---

[16]     The other cases relied upon by Plaintiffs involved elections for the approval of
bonds. *See Hill*, 421 U.S. 289; *Cipriano*, 395 U.S. at 702; *Phoenix*, 399 U.S. at 205. The
elections in these cases "concerned the operations of traditional municipalities exercising the full
range of normal government powers." *See Ball*, 451 U.S. at 366 n.11. Therefore, the
government powers at issue in those cases are analogous to the powers held by traditional
municipal representatives. Because the Commission does not exercise such powers, the Court's
conclusion is not inconsistent with these cases either.

choice of county officials" who "govern their affairs").  Therefore, the democratic concerns that motivated the results—and supported the Supreme Court's broad statements—in cases such as *Kramer* are not implicated here.  *See generally Morris*, 489 U.S. at 693 (focusing on the proposition that the people "govern themselves through their elected representatives").  In other words, the challenged provisions are simply not the type of restrictions that "strike at the heart of representative democracy."  *See Reynolds*, 377 U.S. at 555.

ii.     *Alternate analysis:  Is the election of the Elective Members an "election of general interest" that requires the application of strict scrutiny?*

Even if the Court did not engage in the foregoing threshold analysis, the Court would still conclude that the challenged provisions are subject to rational basis review instead of strict scrutiny.  That is because the election of the Elective Members is not an "election of general interest" subject to the strict scrutiny rule announced *Kramer*.

As an initial matter, the Court notes that this not a matter of first impression in the Eighth Circuit.  The original Missouri Plan—i.e., the "Non-Partisan Selection of Judges Court Plan" adopted by Missouri in 1940—has already been subjected to, and survived, a Fourteenth-Amendment challenge not unlike the one presented here.  *See AAVRLDF*, 994 F. Supp. at 1127–28, *aff'd* 1998 WL 42473.  The plaintiffs in *AAVRLDF*, like Plaintiffs here, claimed that their right to vote was violated because, as non-attorneys, they could not vote for the attorney members of the state's judicial nominating commissions.  *See id.* at 1126–27.  The district court rejected the plaintiffs' argument that the Missouri election provisions were subject to strict scrutiny because the election of the attorney members was not an "election of general interest." *Id.* at 1128.  Applying the rational basis standard of review, the court concluded that the election of the attorney members did not violate the Equal Protection Clause.  *Id.* at 1128–29.  The Eighth

Circuit affirmed, "conclud[ing] that the decision of the District Court is correct and that extended discussion would add nothing of substance to the thorough and well-reasoned opinion of that court." *See* 1998 WL 42473, at *1. Although, as Plaintiffs point out, the Eighth Circuit's opinion in *AAVRLDF* was unpublished, the Court can see no reason why the Eighth Circuit would reach a different conclusion in this case.

Plaintiffs protest, however, that the district court in *AAVRLDF* merely "assert[ed] without argument" that the election at issue was not an election of general interest. Pls.' PI Br. at 9. This is not entirely accurate. *See AAVRLDF*, 994 F. Supp. at 1128 (distinguishing the election of lawyers to a judicial nominating commission from "an election of general interest (such as an election for a legislator)"). However, it is true that the court in *AAVRLDF* did not engage in—and thus, the Eighth Circuit did not specifically affirm—a detailed analysis on this point.

Plaintiffs argue that the election of the Elective Members is an "election of general interest" because "the members of the Commission exercise a traditional government function that has an effect on all citizens of Iowa . . . ." *See* Compl. ¶ 63. The Court will address each component of this contention in turn.

a) *Does the Commission exercise a traditional government function?*

Plaintiffs assert that "[t]he nomination of judges is a traditional government function." *See* Compl. ¶ 61. Therefore, according to Plaintiffs, the Elective Members "perform[] 'the sort of general or important governmental function'" that requires strict scrutiny review. *See* Pls' Br. at 6 (quoting *Ball*, 451 U.S. at 368). The Court does not agree.

Indeed, in the line of cases upon which Plaintiffs rely, the Supreme Court has never suggested that a power triggers strict scrutiny simply because it may, in some sense, be deemed

"governmental." *See generally Hadley*, 397 U.S. at 54 (considering not just whether powers

were "governmental," but also whether or not those "powers [were] general enough and have

sufficient impact throughout the district to justify the conclusion" that strict scrutiny should be

applied). Instead, only certain "sort[s] of governmental powers" have been deemed sufficient to

"invoke the strict demands of *Reynolds*" and its progeny. *See Ball*, 451 U.S. at 366. In this

context, "traditional government functions" include:

> [T]he ability to "levy and collect taxes, issue bonds with certain restrictions, hire and
> fire teachers, make contracts, collect fees, supervise and discipline students, pass on
> petitions to annex school districts, acquire property by condemnation, and in general
> manage the operations of the junior college," appoint county officials, make
> contracts, establish and maintain a courthouse and jail, administer the county welfare
> system, perform duties in connection with elections, set the county tax rate, build
> roads and bridges, adopt the county budget, build and run hospitals, airports, and
> libraries, fix school district boundaries, establish a housing authority, and determine
> the election districts for county commissioners.

*See DeJulio v. Georgia*, 290 F.3d 1291, 1295 (11th Cir. 2002) (quoting *Hadley*, 397 U.S. at

53–45 and citing *Avery*, 390 U.S. at 476–77) (internal citation omitted). Plainly, the

Commission does not exercise any of these powers, or any powers of similar type or magnitude.

To the contrary, the Commission simply "selects and forwards to the governor the names of

three applicants it deems best qualified" for each vacant position. *See Dool*, 2010 WL 4568993,

at *2; *see also* Iowa Const., art. 5, § 16. Therefore, the Court concludes that the Commission

"simply does not exercise the sort of governmental powers that invoke the strict demands of

*Reynolds*" and its progeny. *See Ball*, 451 U.S. at 366; *see also Bradley*, 916 F. Supp. at 1456

("[T]he [judicial nominating] Commission does not perform traditional governmental

functions."); *AAVRLDF*, 994 F. Supp. at 1128 n.49.

None of the authorities cited by Plaintiffs compel a different conclusion. In support of

their contention that the Commission performs a "traditional government function," plaintiffs cite three cases and a provision of the United States Constitution.[17]  *See* Compl. ¶ 61 (citing *Richardson v. Koshiba*, 693 F.2d 911, 914 (9th Cir. 1982); *In re Advisory Op. to the Governor*, 276 So.2d 25, 29–30 (Fla. 1973); and U.S. Const. art. II, § 2); Pls.' PI Br. at 12 (citing *Richardson*, 693 F.2d at 914 and *McMillan v. Svetanoff*, 793 F.2d 149, 153–54 (7th Cir. 1986)).

The cases relied upon by Plaintiffs are neither binding nor persuasive authority.  The opinions in *Richardson* and *McMillan* dealt with the entirely separate issue of judicial immunity.  *See Richardson*, 693 F.2d at 913–14; *McMillan*, 793 F.2d at 150.  In the third case cited by Plaintiffs, the Supreme Court of Florida opined that "[t]he appointment of a judge is an executive function and the screening of applicants which results in the nomination of those qualified is also an executive function," but did so in answering a question regarding the balance of powers between the executive and judicial branches in the judicial selection process. *See In re Advisory Op.*, 276 So.2d at 28–29.  Even if the Court found these cases to be persuasive, they establish—at most—that the Commission's power might, in some sense, be described as "executive," rather than "legislative" or "judicial."  But none of these cases address the key issue

---

[17]        At the hearing, Plaintiffs' counsel also argued that "the distinction that *Ball* and *Salyer* make is between quasi-private functions and traditional Government functions."  Tr. 15:17–19.  As an initial matter, the Court is not convinced that this is the only relevant distinction between functions that have been deemed sufficiently and insufficiently "governmental."  In *Hadley*, for example, the Court referred to things such as making contracts and collecting fees as "governmental functions," even though private entities regularly make contracts and collect fees.  *See* 397 U.S. at 53–54.  But even if Plaintiffs' public-private distinction were the correct one, the Court cannot agree with Plaintiffs' assertion that nominating judges has "never been done in the history of this country by a private entity or a private organization."  *See* Hr'g. Tr.16:9–11.  In Iowa, prior to 1962, some judges were nominated by private organizations—political parties.  *See* Uhlenhopp at 54; *see also* Kales at 226–27 (arguing that, in certain metropolitan districts, "elected" judges were, in effect, appointed by private "politicocrats of the extra-legal government").

raised in this case—namely, whether or not the Commission's powers are "the sort of governmental power[] that invoke[s] the strict demands of *Reynolds*" and its progeny. *See Ball*, 451 U.S. at 366.

Additionally, the Court finds that Plaintiffs' citation—without explanation—to the United States Constitution is not dispositive of this issue. *See* Compl. ¶ 84 (citing U.S. Const., Art. II, § 2). The provision cited by Plaintiffs states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Judges of the supreme Court . . . ." U.S. Const., Art. II, § 2. As an initial matter, it is not at all clear that the government function described in Article II is the same function performed by the Commission. Although the power of the Commission and the power of the President in Article II, section 2 may be generally described as "nominating judges," the Commission's power in the Iowa judicial selection process is very different from the President's power in the federal judicial selection process. Unlike the President, the Commission cannot actively select candidates; rather, the Commission simply evaluates and selects from the applications that it receives. *See* Iowa Code § 46.14(1). Additionally, the Commission—unlike the President—has no power to make actual appointments. *See* Iowa Const., art. V, § 16 (giving the Governor the ultimate appointment power). Therefore, although both the President and the Commission engage in "nomination" in some sense, their powers are not as identical as Plaintiffs suggest. More importantly, even if the Commission's function is comparable to that of the President, the Court has seen nothing in the Supreme Court's voting rights jurisprudence that suggests that all federal powers are "traditional government functions" in the relevant sense or that all traditional federal government functions

are also traditional state government functions.[18]  Therefore, Plaintiffs' mere citation to Article

II, section 2 does not persuade the Court that the Commission performs a "traditional

government function" in the relevant sense.

b) *Does the Commission exercise government powers that affect all Iowans?*

Plaintiffs also argue that they, like all Iowans, "have a substantial interest in, and are

significantly affected by, the nomination of the justices and judges of Iowa's courts because

'state court judges possess the power to "make" common law . . . [and] have immense power to

shape the States' constitutions as well."  Compl. ¶ 11 (quoting *Republican Party of Minn.*, 536

U.S. at 784) (omission and addition in original).  The Court does not agree.  "To be sure,

decisions of the [Iowa] Supreme Court and [Iowa] Court of Appeals can affect the daily lives of

[Iowans], but they are judicial decisions, not decisions of the Commission."  *See Dool*, 2010 WL

4568993, at *2.  Although the Commission has the power to affect the composition of a portion

of the Iowa judiciary,[19] Plaintiffs have not suggested—let alone pled sufficient facts to support a

_____

[18]      Indeed, the proliferation of different judicial selection systems suggests that there
is no single "traditional" way to nominate state court judges.

[19]      The Court rejects Plaintiffs' assertion that the Commission "determine[s] the
composition of the Iowa judiciary."  *Id.* ¶ 79; *see also id.* ¶ 69 (averring that "the Commission
decides who will sit in judgment over the citizens of Iowa"); ¶ 42 (arguing that the Commission
"determines the composition of the judicial branch of government in Iowa").  As an initial matter
the Commission has no role whatsoever in the selection of district court judges.  *See* Iowa
Const., art. V, § 16 (providing for separate district court nominating commissions).  And,
"[r]ealistically, the daily affairs of [Iowa] residents are more directly affected by decisions of
[district] courts" than by the decisions of the courts of last resort.  *See Dool*, 2010 WL 4568993,
at *2.  Therefore, the Commission does not, as a factual matter, determine the composition of the
entire Iowa judiciary—or even the composition of its most important parts.  Additionally, the
Commission does not actually determine the composition of either the Iowa Court of Appeals or
the Iowa Supreme Court because the Commission only acts when there is a vacancy.  *See* Iowa
Const., art. V, § 16.  And even then, the Commission does not have the power to actively select
candidates, but is limited to considering the applications it receives.  *See* Iowa Code § 46.14(1).
Moreover, the Governor—not the Commission—actually determines who will become a judge.

reasonable inference that—the Commission has any power to affect the specific outcomes of any judicial decisions. Therefore, the Court rejects Plaintiffs' attempt to conflate the powers of the Commission with the powers of the Iowa judiciary.

Contrary to Plaintiffs' assertions, the Commission has no duties, functions or powers which directly affect the daily lives of all Iowans. *See Dool*, 2010 WL 4568993, at *2. The Court acknowledges that, by participating in the selection of judges, the Commission may have, in some sense, an effect on the development of the common law in Iowa. However, the Commission's ability to affect the development of the common law is, at best, highly indirect and remote. Plaintiffs have not cited—and the Court is not aware of any—cases where this type of indirect, remote effect has been found sufficient to trigger the application of strict scrutiny.

Therefore, the Court concludes that the Commission's activities do not "have sufficient impact" on the daily lives of Iowans to trigger the application strict scrutiny. *See Hadley*, 397 U.S. at 54.

c) *Conclusion - Nature of the election.*

For the reasons stated above, the Court concludes that the Commission does not exercise a traditional government function and has, at best, only an indirect and remote impact on the daily lives of Iowans. Therefore, the election of the Elective Members to the Commission is not an "election of general interest" that triggers the application of strict scrutiny. For this additional, independent reason, the Court concludes that the challenged provisions are subject to rational basis review.

_____

*See id*. It is true, as Plaintiffs point out, that the Governor does not have unfettered discretion in choosing judges. However, this does not change the fact that the Governor has the power, ultimately, to determine who will fill a given judicial vacancy.

b.      *Application of rational basis review.*

For the reasons stated above, the challenged provisions are subject to rational review, not strict scrutiny. Therefore, Plaintiffs have the burden to "negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *See Garrett*, 531 U.S. at 367.

Plaintiffs do not seriously dispute that the state of Iowa has a legitimate interest in selecting well-qualified judges to serve on the Iowa State Supreme Court and Iowa Court of Appeals. However, Plaintiffs argue that the method by which the Elective Members are chosen is not rationally related to that interest. Plaintiffs argue that, even if attorneys are better situated to evaluate legal qualifications than the public at large, that fact would only provide a rational basis for the inclusion of attorneys on the Commission—not for having those attorneys selected by other members of the Iowa Bar. *See* Clerk's No. 36 at 3; Hr'g Tr. 17:16–19. The Court does not agree. It is conceivable that the people of Iowa, when they chose to adopt the current judicial selection system, believed that attorneys were not only better able to select judges, but also better able to select Commission members from their peers. *See AAVRLDF*, 994 F. Supp. at 1128 ("Defendants contend that lawyers properly elect lawyers to the commissions for much the same reasons that attorneys are well-suited to nominate judges. Defendants assert that attorneys know their peers, and they know who will be best-suited to evaluate the ability of commission aspirants."). Plaintiffs have not pled any facts that negative this conceivable, reasonable rationale. *See Garrett*, 531 U.S. at 367. Therefore, for this reason alone, Plaintiffs have failed to meet their burden. *See id*.

Additionally, the state of Iowa has a legitimate interest in increasing judicial legitimacy

by decreasing the role of partisan politics in the judicial selection process. If the public believes that "judges are just politicians in robes—then there is no reason to prefer their interpretation of the law or Constitution over the opinions of the real politicians representing the electorate." O'Connor at 489; *see also* Uhlenhopp at 62 (noting "the loss of public confidence which results from politics in the courts"); Pound at 66 (noting that the injection of politics into the judiciary had, by 1906, "almost destroyed the traditional respect for the bench"). The method of selecting the Elective Members is rationally related to this interest because it means that some—though not all—of the Commission members are selected without direct involvement of the political branches of government. Indeed, in choosing the present system, Iowans may have reasonably sought to avoid a partisan confirmation process, which can become—as it has at the federal level—"quite nasty and brutish." *See generally* Orrin G. Hatch, *The Constitution as the Playbook for Judicial Selection*, 32 Harv. J. L. & Pub. Pol'y 1035, 1038 (2009). They may also have sought to avoid the "redundancy and inefficiency" that characterizes systems in which the Governor appoints all of the members of the judicial nominating commission. *See* Joseph A. Colquitt, *Rethinking Judicial Nominating Commissions: Independence, Accountability, and Public Support*, 34 Fordham Urb. L.J. 73, 87 (2007). Plaintiffs have not pled any facts that negative these additional conceivable, reasonable rationales. *See Garrett*, 531 U.S. at 367.

Because Plaintiffs have failed to plead sufficient facts to establish that the challenged provisions violate the Equal Protection Clause, Count 2 fails to state a claim for which relief may be granted.

### B. *Plaintiffs' Motion for Preliminary Relief*

In light of the foregoing, Plaintiffs' motion for preliminary relief is denied as moot.

## IV. CONCLUSION

Undoubtedly, the right to vote for political representatives is the bedrock of American democracy. In this case, however, Plaintiffs are asking the Court to radically expand the scope of this fundamental right beyond all existing precedent and to recognize an entirely new Fourteenth Amendment "right" to greater influence in the selection of judges. Their claims, therefore, are fatally flawed. Plaintiffs may prefer that Iowa had a different method of judicial selection, but absent a violation of a clearly-established constitutional right, the people of Iowa are entitled to retain the judicial selection system they chose in 1962.

For all of the reasons stated above, the Court concludes that Plaintiffs have failed to state a claim for which relief may be granted. Therefore, "Defendants' Motion to Dismiss" (Clerk's No. 10) is GRANTED and Plaintiffs' motion for preliminary relief (Clerk's No. 2) is DENIED as moot.

IT IS SO ORDERED.

Dated this ___19th___ day of January, 2011.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT